**Betty BRYANT, Personal Representative of the Estate of Everald Grace Nichols, Plaintiff–Appellant,**

**v.**

**COMMUNITY CHOICE CREDIT UNION, Defendant–Appellee.**

**No. 05CA0910.**

Colorado Court of Appeals, Div. VI.

Jan. 25, 2007.

Benson & Case, LLP, John Case, Denver, Colorado, for Plaintiff–Appellant.

Collins & Pringle, LLC, Patrick J. Collins, Dwight L. Pringle, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge CARPARELLI.

This case concerns a fiduciary's alleged improper use of a credit union account, the credit union's duties to the alleged principal, and the credit's union's rights to setoff. Plaintiff, Betty Bryant, the personal representative of the Estate of Everald Grace Nichols, appeals the trial court's judgment in favor of defendant, Community Choice Cred-

it Union. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

Nichols was eighty-one years old when she and Charles Richard Lynch, who was her agent under the terms of a general power of attorney, opened an account with the defendant credit union. When Nichols went to the credit union a year later to transfer funds to another financial institution, she was told the account was closed. She later learned that Lynch had transferred funds out of the account for his own benefit, purchased two certificates of deposit with assets from the account, and pledged those certificates of deposit as collateral for his personal loans from the credit union. She also learned that the credit union had taken the pledged assets after Lynch defaulted on those loans.

About two years later, plaintiff was appointed as Nichols's conservator, and she sued the credit union, asserting claims titled forgery and theft, accepting a forged instrument, ultra vires acts, negligence and negligence per se, conversion, breach of duty of good faith, money had and received, resulting and constructive trust, statutory liability, and punitive damages. After Nichols died, the trial court granted the credit union's motion for summary judgment on all claims except the claim titled negligence and negligence per se and the one titled punitive damages.

The two surviving claims were tried to a jury. At the end of plaintiff's case, the credit union moved for a directed verdict pursuant to C.R.C.P. 50. The trial court concluded, among other things, that, in accordance with §§ 15-15-221 and 15-15-222, C.R.S.2006, the credit union owed no duty to Nichols with regard to Lynch's use of the funds in the account. Accordingly, it granted the credit union's motion and entered judgment for the credit union as to both claims.

Plaintiff asserts that the trial court erred when it granted the credit union's motions for directed verdict and summary judgment. She argues that she is entitled to recoup from the credit union $142,974 that it obtained when it liquidated two certificates of deposit that secured Lynch's personal debt. We agree that the claims entitled negligence and negligence per se, punitive damages, and conversion were improperly dismissed.

## II. Directed Verdict Based on Duty of Care

Plaintiff contends that the trial court erred when it granted the credit union's motion for directed verdict as to her negligence and punitive damages claims. We agree.

### A. Undisputed Facts

The parties do not dispute the following facts pertinent to the account activities.

The credit union president and an employee helped Nichols and Lynch open account 9770 at the credit union. The account card was filled out by the credit union employee. It includes a check mark in a box indicating that it was a "multiple party account with survivorship," but the space provided to identify the account owners contains only Lynch's name. The section for account designation contains no agency designation; the box to indicate "agency" is not checked and the line for the name of the agent is blank.

At the same time, either Nichols or Lynch presented the credit union president with a general power of attorney designating Lynch as Nichols's agent. A notation of "P.O.A." was made in the credit union's computerized account records, and a copy of the power of attorney was placed in the account file. The power of attorney granted Lynch the following banking powers:

> To make, receive and endorse checks and drafts, deposit and withdraw funds, acquire and redeem certificates of deposit, in banks, savings and loan associations and other institutions, execute or release such deeds of trust or other security agreements as may be necessary or proper in the exercise of the rights and powers herein granted.

Two days later, a check payable to Nichols in the amount of $331,069, the proceeds from the sale of her home, was deposited into the account. On the same day, Lynch transferred $131,069 to account 9769, and $100,000 to account 6278, both of which were in his name alone. Four days later, Lynch used

multiple-party account funds to purchase a $100,000 three-month certificate of deposit bearing his name and that of Nichols, which the credit union designated as account 9770/msc. Lynch also purchased a certificate of deposit in the amount of $50,000 using the assets in account 6278.

Eight days later, the credit union loaned Lynch $50,000 secured by the certificate of deposit associated with account 6278. Six days later, the credit union loaned Lynch $100,000 secured by the jointly held certificate of deposit.

When Lynch defaulted on the $100,000 loan after only three months, the credit union accepted a new note at a higher interest rate. Lynch signed that note in his own name, but also signed it in Nichols's name as a maker under the purported authority of the power of attorney. In that note, Lynch also pledged $100,000 of the assets in account 9770 as security.

About the same time, Lynch defaulted on the $50,000 loan, and the credit union accepted a note in the amount of $43,000 at the same interest rate as the original note. Lynch signed that note as the only maker.

Less than a year later, after Lynch again defaulted on both loans, the credit union took ownership of the $100,000 certificate of deposit and $43,000 of the $50,000 certificate to satisfy the loan obligations. It, thereby, emptied the multiple-party account.

### B. Plaintiff's Evidence

On cross-examination, the credit union president agreed that, when Nichols gave her the power of attorney, she understood that Nichols expected Lynch to act as her fiduciary agent. The credit union president also testified that she knew that Lynch contributed only $26 to the account assets and that Nichols contributed $331,069, the proceeds from the sale of her home.

Plaintiff also presented evidence that credit union employees were suspicious that Lynch was misusing the account funds.

Plaintiff's expert testified regarding the standard of care required of financial institutions in Colorado, and opined that the credit union breached that standard when it permit-

ted Lynch to pledge the assets from the multiple-party account to secure his personal debt.

### C. Court's Ruling.

When granting the motion for directed verdict, the court stated that the evidence was, for all relevant purposes, uncontested as to certain facts, and that, considering the evidence in the light most favorable to plaintiff, a reasonable juror could not find different facts.

The court stated that Nichols knowingly opened the account, after the rights and risks of co-ownership of the account were explained to her, including the full authority of either party to deal with all funds in the account. It also noted that the provision on the account card that would indicate an agency account was not marked. The court ruled that the power of attorney was presented to the credit union president, but it was not operational or relevant to the transaction in any way and did not transform the account into a trust account.

The court also reached conclusions which can be summarized as follows:

- Sections 15–15–221 and 15–15–222 specifically negate the common law duty that would exist under the theories and standards of care to which plaintiff's expert testified and plaintiff's common law and statutory claims of negligence and negligence per se. Any duty that might exist under common law for a financial institution to look to the source of deposits or to question the application of payments from the account by an account member is negated, specifically, by these statutes. To impose a duty on the credit union to specifically recognize the source of the funds from Nichols, as compared to from Nichols and Lynch, or from only Lynch, would be specifically contrary to these statutes.

- Under these statutes, it is not the responsibility of a credit union to audit or analyze the application of multiparty accounts to see whether they are going to the benefit of only one accountholder,

which responsibility is the basis of plaintiff's claims.

· There is no liability on the part of the credit union.

· Although a common law cause of action might have otherwise existed, it was negated when the legislature passed the referenced statutes.

### D. Standard of Review

■ We review a directed verdict de novo. *Park Rise Homeowners Ass'n v. Res. Constr.*, 155 P.3d 427 (Colo.App. 2006); *City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472 (Colo.App.2003).

■ A directed verdict should be granted only in the clearest of cases. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 686 (Colo.1998). A court considering a motion for directed verdict must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *Huntoon, supra.* If the evidence viewed in this light cannot support a verdict in favor of the nonmoving party, the court may grant a motion for directed verdict, and the issue should not be submitted to the jury. *Huntoon, supra.*

### E. Plaintiff's Arguments

Plaintiff's contentions are premised on the following arguments:

· The holdings in *Cox v. Metropolitan State Bank, Inc.*, 138 Colo. 576, 336 P.2d 742 (1959), and *Mancuso v. United Bank*, 818 P.2d 732 (Colo.1991), regarding resulting and constructive trusts, apply to her claims.

· The credit union owed Nichols a duty of care under §§ 4–3–203, 4–3–307(b)(4), and 15–1–106, C.R.S.2006.

· Sections 15–15–221 and 15–15–222 do not bar recovery.

We address each of these arguments in turn.

### 1. Resulting and Constructive Trusts

Plaintiff contends that she presented sufficient evidence that the assets of the multiple-party account were subject to a resulting trust and that assets transferred to others by Lynch in violation of his fiduciary duties are subject to a constructive trust under *Cox v. Metropolitan State Bank, Inc., supra,* and *Mancuso v. United Bank, supra.* We agree.

■ "A resulting trust is a trust implied by law when the circumstances surrounding the transfer of property raise the inference that the parties intended to create a trust." *Mancuso v. United Bank, supra,* 818 P.2d at 738–39. Such a trust arises when a person disposes of property under circumstances in which, subject to evidence to the contrary, it can be inferred that the transferor did not intend to convey a beneficial interest in the property to the transferee. *Mancuso v. United Bank, supra,* 818 P.2d at 739; *Leverage Leasing Co. v. Smith,* 143 P.3d 1164 (Colo.App.2006); Restatement (Second) of Trusts § 404 (1959).

■ A constructive trust is a flexible equitable remedy that may be imposed to prevent unjust enrichment. It enables the restitution of property that in equity and good conscience does not belong to the defendant. *Mancuso v. United Bank, supra; Yetter Well Serv., Inc. v. Cimarron Oil Co.,* 841 P.2d 1068 (Colo.App.1992); *see In re Amdura Corp.,* 167 B.R. 640 (D.Colo.1994), *aff'd,* 75 F.3d 1447 (10th Cir.1996); *In re W. Urethanes, Inc.,* 61 B.R. 243, 245 (Bankr.D.Colo. 1986). A constructive trust is also appropriate when innocent third persons later acquire an interest in such property. *See Yetter Well Serv., Inc. v. Cimarron Oil Co., supra; Mt. Sneffels Co. v. Estate of Scott,* 789 P.2d 464 (Colo.App.1989).

#### a. *Cox and Mancuso*

In *Cox,* the supreme court concluded that the beneficiary of a trust had a cause of action against a bank that had set off the beneficiary's trust funds against the trustee's personal debt to the bank. The court quoted with approval an 1878 Michigan case, *Burtnett v. First National Bank,* 38 Mich. 630 (1878), which held that a depository that received from an agent or trustee funds belonging to the principal or beneficiary could neither appropriate those funds by its sole act to satisfy the debt of the agent or trustee

nor, based on its lack of knowledge of the agency or trust relationship, successfully prevent the principal or beneficiary from recovering the funds appropriated by the depository.

In *Mancuso,* the supreme court relied on the holding in *Cox* and reversed the trial court's grant of summary judgment in favor of the bank. There, a mother and son opened several joint accounts. The son took out two loans from the bank in the name of a corporate entity and personally guaranteed them. When those loans went into default, the bank exercised its right of setoff against the accounts held jointly by the son and his mother. Neither the son nor the mother was in default on any personal loan. The bank had not informed the son or the mother about its statutory right of setoff. The mother sued, alleging, as pertinent here, that the bank negligently failed to inform her about its right of setoff and that a constructive trust was created when she deposited her funds.

The supreme court held that summary judgment was improper because there were genuine issues of material fact regarding (1) whether a constructive trust should be imposed on the bank based on evidence that the bank obtained the mother's deposit through an abuse of a confidential relationship; and (2) whether the bank knew that the son held the title to the accounts and certificates of deposit subject to resulting trusts.

### b. Conclusions Regarding Resulting and Constructive Trusts

■ Here, there is no dispute that, when Nichols and Lynch opened the account, a power of attorney designating Lynch as Nichols's attorney-in-fact was given to the credit union president. There is also no dispute that only $26 in the account came from Lynch's funds, and that $331,069 came from the sale of Nichols's home, and that the credit union knew this. Viewed in the light most favorable to plaintiff, the evidence is sufficient to permit a jury to conclude that Nichols intended Lynch to act as her fiduciary and have no beneficial interest in the property, and, thus, that Lynch possessed

the account assets subject to an actual or resulting trust.

There is also sufficient evidence to permit a jury to conclude (1) that to secure personal loans from the credit union, Lynch pledged certificates of deposit that in equity and good conscience did not belong to him, and (2) that the credit union later acquired those assets as a result of Lynch's pledge and default on the personal loans. Therefore, we conclude that there is sufficient evidence upon which a constructive trust could be imposed on the certificates of deposit the credit union liquidated.

### 2. Credit Union's Duty of Care

Plaintiff argues that the trial court erred when it concluded that the credit union did not owe Nichols a duty to exercise reasonable care with regard to the account. We agree.

### a. Duty of Ordinary Care

In Colorado, a credit union has a duty to exercise ordinary care in the handling of deposits and is liable for damages arising from the breach of that duty. Section 4-4-103(a), (e), C.R.S.2006; *see also* Restatement, *supra,* § 324 (when a trustee, acting in breach of the trust, deposits trust funds in a bank, and the bank has notice of the breach of trust, the bank is liable for participating in the breach by receiving or permitting the trustee to withdraw the trust funds).

### b. Knowledge of Fiduciary's Breach

The term "fiduciary" includes any agent or other person acting in a fiduciary capacity for any person or trust, whether the trust is expressed, resulting, or constructive. Section 15-1-103(2), C.R.S.2006.

■ An entity is deemed to have notice that a fiduciary has breached his or her fiduciary duty when (1) it knows of the fiduciary status of the fiduciary; (2) in a transaction it knows to be for the personal benefit of the fiduciary, it takes for value a negotiable instrument (including a qualifying promissory note) issued by the fiduciary in the capacity of fiduciary; and (3) the represented person makes a claim to the instrument or its

proceeds on the basis that the transaction was a breach of the fiduciary's duties. Section 4–3–307(b)(4), C.R.S.2006; *see* § 4–3–104(a), C.R.S.2006; *Haberl v. Bigelow*, 855 P.2d 1368 (Colo.1993)(a note containing an unconditional promise to pay a fixed sum on a definite date is a negotiable instrument); *see also* Restatement, *supra*, § 288 (when a trustee, in breach of trust, transfers trust property to another who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer).

### c. Conclusions Regarding the Credit Union's Duty of Care

■ Here, it is undisputed that a copy of the power of attorney was placed in the account file and that the computer record regarding the account was annotated with a reference to the power of attorney. Although the credit union president testified that the credit union did not rely on the power of attorney in opening the account, she also testified that she understood when Nichols gave her the power of attorney that Nichols intended for Lynch to act as her agent.

Plaintiff's expert testified that, as a result of its receipt of the power of attorney, the credit union knew that Lynch was acting as a fiduciary for Nichols and, thus, it should have protected Nichols's deposits from Lynch's personal loan transactions. The expert also testified that, under the power of attorney, Lynch had implicit power to borrow in Nichols's name only if it was for Nichols's benefit. He stated that, when a fiduciary borrows from a financial institution and pledges his principal's assets as security, the financial institution has a strict duty to protect the funds of the principal. He testified that, here, the credit union should have refused to loan Lynch the $100,000 that was secured by the assets of the multiple-party account. He testified further that the credit union owed Nichols these duties notwithstanding the account card indicating that it was a multiple-party account. Based on this testimony, the expert opined that the credit union's actions were below the standard of care for financial institutions in Colorado and, thus, were negligent. Last, plaintiff's expert testified that it

was below the standard of care for the credit union to liquidate the certificates of deposit to satisfy Lynch's defaulted loans.

We conclude that plaintiff presented sufficient evidence upon which a jury could find that the credit union breached its duty to exercise reasonable care in the handling of deposits in account 9770.

With regard to the funds the credit union took when it foreclosed the $100,000 promissory note, plaintiff presented sufficient evidence upon which a jury could find that the credit union knew (1) Lynch was acting in a fiduciary capacity with regard to the funds in that account; (2) Lynch signed the promissory note for $100,000 as purported agent for Nichols; (3) the loan transaction in which it took the $100,000 promissory note was for Lynch's personal benefit; (4) Lynch breached his fiduciary duties when he signed the $100,000 promissory note as purported agent for Nichols; and (5) Nichols later claimed a right to funds Lynch had pledged in breach of his fiduciary duties.

With regard to the funds the credit union took when it foreclosed the $43,000 promissory note, plaintiff presented sufficient evidence upon which the jury could find that the credit union knew (1) Lynch had transferred funds from account 9770 into accounts to which Nichols did not have access, including account 6278; (2) Lynch's transfer of those funds was a breach of his fiduciary duties; (3) the loan transaction in which it took the $43,000 promissory note was for Lynch's personal benefit; (4) Lynch's pledge of assets in account 6278 was a pledge of assets he had obtained in breach of his fiduciary duties; (5) the loan transaction in which it took the $43,000 promissory note was for Lynch's personal benefit; and (6) knew Nichols later claimed a right to funds Lynch had pledged in breach of his fiduciary duties.

### 3. Effect of §§ 15–15–221 and 15–15–222

Plaintiff also asserts that the trial court erred when it concluded that §§ 15–15–221 and 15–15–222 of the Uniform Probate Code as adopted in Colorado (UPC) negate any

common law duty the credit union might have had.

Plaintiff argues that

(1) as a result of the power of attorney to Lynch, § 15–15–202, C.R.S.2006, operates and, by its terms, renders §§ 15–15–221 and 15–15–222 inapplicable; and

(2) §§ 15–15–221 and 15–15–222 do not negate her common law causes of action.

■■■ The credit union argues that under UPC §§ 15–15–221 and 15–15–222 regarding multiple-party accounts, which provisions were passed after the events in *Mancuso*, see Colo. Sess. Laws 1990, ch. 116 at 915, it had no duty to inquire about the source of payments into either the multiple-party account or Lynch's personal accounts; acted properly when it permitted Lynch, as a multiple-party accountholder, to withdraw sums from the multiple-party account; and had no duty to inquire about the application of the sums Lynch withdrew from that account. We agree with plaintiff.

### a. Statutory Interpretation

■■■ Statutory interpretation is a question of law subject to de novo review. *Klinger v. Adams County Sch. Dist. No. 50*, 130 P.3d 1027 (Colo.2006). Under the basic principles of statutory interpretation, we first determine whether the statutory language has a plain and unambiguous meaning. *People v. Yascavage*, 101 P.3d 1090, 1093 (Colo. 2004). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997); *see also Klinger, supra.* The statutory scheme is read as a whole "to give 'consistent, harmonious and sensible effect to all of its parts,' " in accordance with the presumption that the legislature intended the entire statute to be effective. *Colo. Water Conservation Bd. v. Upper Gunnison River Conservancy Dist.*, 109 P.3d 585, 593 (Colo.2005) (quoting *Bd. of County Comm'rs v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192 (Colo.2004)). "A statutory interpretation leading to an il-

logical or absurd result will not be followed." *Frazier v. People*, 90 P.3d 807, 811 (Colo. 2004). We avoid constructions that are at odds with the legislative scheme. *Klinger, supra.*

### b. Section 15–15–221

Section 15–15–221 provides that "[a] financial institution may enter into a contract of deposit for a multiple-party account to the same extent it may enter into a contract of deposit for a single-party account," and the financial institution is not required to inquire "as to the source of a deposit to an account or as to the proposed application of a payment from an account." The provision does not address a financial institution's duties when it has actual knowledge regarding the source of a deposit to an account or the proposed application of payments from an account.

### c. Section 15–15–222

Section 15–15–222 permits a financial institution to pay sums on deposit in a multiple-party account to one or more of the parties, "whether or not another party is disabled, incapacitated or deceased when payment is requested." Section 15–15–222(1), C.R.S. 2006.

### d. Section 15–15–202

However, § 15–15–202 limits the scope of the foregoing provisions, stating that they do not apply to fiduciary or trust accounts "in which the relationship is established other than by the terms of the account."

### 4. Conclusions Regarding Duties of Care

Here, we first conclude that Lynch's capacity as Nichols's agent and fiduciary was established by the power of attorney, and not by the terms of the multiple-party account, as reflected on the account card. Because the fiduciary relationship was established other than by the terms of the account, § 15–15–202 applies, and §§ 15–15–221 and 15–15–222 do not. Accordingly, the trial court erred when it entered a directed verdict based on the latter sections.

Moreover, even assuming §§ 15–15–221 and 15–15–222 applied, they would not have relieved the credit union of its other common law and statutory duties of care. And, here, there was sufficient evidence upon which the jury could conclude that the credit union was negligent and that its negligence caused Nichols's damages.

### a. Sections 15–15–221 and 15–15–222

Although § 15–15–221 provides that a financial institution has no duty to inquire about the source of funds deposited into a joint account or the proposed application of a payment from such an account, it does not explicitly or implicitly address circumstances in which the financial institution knows, without the need for additional inquiry, the source of funds deposited and the application of a transfer from such an account into another account within the same financial institution.

Similarly, although § 15–15–222 permits a financial institution to pay sums in a joint account to any accountholder, it does not explicitly or implicitly address the duties of a financial institution that obtains a pledge of account funds as security for the personal debt of a person named on the account who it knows has access only as a fiduciary and not as a beneficial owner of the account assets.

Reading the statutory scheme pertaining to financial institutions, commercial transactions, fiduciaries, and trusts as a whole, and giving consistent, harmonious, and sensible effect to all provisions, we conclude that when a financial institution has actual knowledge that an accountholder is a fiduciary and not a beneficial owner of account assets, neither § 15–15–221 nor § 15–15–222 explicitly or implicitly relieves the financial institution of duties imposed by the UPC, the Uniform Commercial Code, or the Uniform Fiduciary Law.

█ We also conclude that when there is evidence that a person transferred property with the intention that the recipient act as a fiduciary and have no beneficial interest in the property, neither statute explicitly or implicitly precludes a court from concluding that the recipient possesses the property subject to a resulting trust.

We conclude further that §§ 15–15–221 and 15–15–222 do not preclude the court from permitting the principal or beneficiary to recover the funds from a credit union under available theories of liability. Hence, we conclude that §§ 15–15–221 and 15–15–222 do not preclude the application of the holdings in *Mancuso* and *Cox* regarding resulting and constructive trusts.

### b. Sufficient Evidence

It was undisputed that Lynch quickly transferred $100,000 of the account funds into an account to which Nichols did not have access, used $50,000 of this amount to purchase a certificate of deposit, and pledged the certificate to secure a personal loan. It was also undisputed that Lynch used $100,000 that remained in the account to purchase another certificate of deposit and pledged that certificate to secure another personal loan. In addition, plaintiff presented evidence that employees of the credit union knew that Lynch was using account assets for his personal benefit. It was further undisputed that the credit union liquidated the two certificates of deposit when Lynch defaulted on the personal loans.

Thus, plaintiff presented sufficient evidence that the credit union breached its duty of ordinary care in the handling of the account, and that the funds the credit union obtained when it liquidated the certificates of deposit were subject to a constructive trust.

Accordingly, we conclude that plaintiff presented sufficient evidence of negligence and the estate's entitlement to punitive damages to defeat the credit union's motion for a directed verdict, and that the trial court erred when it granted that motion based on its conclusion that §§ 15–15–221 and 15–15–222 precluded plaintiff's claims.

### IV. Summary Judgment

Plaintiff also asserts that the trial court erred in dismissing her claims for "resulting and constructive trusts," ultra vires acts, and conversion on summary judgment. We con-

clude that the court erred only as to the conversion claim.

We review a grant of summary judgment de novo and construe all facts in the light most favorable to the nonmoving party. *Natural Energy Res. Co. v. Upper Gunnison River Water Conservancy Dist.*, 142 P.3d 1265 (Colo.2006). Under C.R.C.P. 56, a motion for summary judgment should only be granted when there are no genuine issues of any material fact. The moving party has the initial burden to show that there is no genuine issue as to material fact, but once that initial burden is met, the burden shifts to the nonmoving party to show that there is a triable issue of fact. *McCormick v. Union Pac. Res. Co.*, 14 P.3d 346 (Colo.2000).

### A. Claim for Resulting and Constructive Trusts

██ In her claim for relief entitled "resulting and constructive trusts," plaintiff requests that a constructive trust be imposed upon the credit union as a remedy. The trial court correctly stated that such trusts are remedial in nature and are inappropriately pled as a separate cause of action. *See Mancuso, supra.* Although plaintiff may argue these remedy theories in support of her other claims, they are not theories of liability. Therefore, we conclude that the trial court correctly dismissed them on summary judgment.

### B. Claim for Ultra Vires Acts

In plaintiff's claim for relief titled "ultra vires acts," she seeks to impose liability on the credit union for violation of § 11–30–101, et seq., C.R.S.2006, which pertains to the establishment and operation of credit unions. Enforcement of these statutes is vested in the Commissioner of Financial Services.

The trial court held that the allegations that the credit union acted outside its statutory authority properly were subsumed by plaintiff's negligence and negligence per se claim.

Although plaintiff contends that the summary judgment was erroneous, she cites no authority and provides no substantive argument on the issue, and we perceive no error

in the trial court's ruling. On remand, however, to the extent that the statutory provisions are relevant to establish the credit union's duty of care, they should be considered.

### C. Claim for Conversion

██ Plaintiff's claim for "conversion" alleges that she had defenses to the promissory note and that the credit union wrongfully deprived her of funds represented by the $100,000 certificate of deposit associated with the account. She argues that, under § 15–15–211, C.R.S.2006, the funds in the account were owned by each accountholder in proportion to the respective amounts each contributed, and that, in combination, §§ 15–15–206 and 15–15–211(2), C.R.S.2006, entitle her to bring a conversion claim against the credit union for seizing funds that Lynch held in trust. We agree.

During the lifetime of the accountholders, "an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent." Section 15–15–211(2). This proportionate ownership applies

> only to controversies between those persons and their creditors and other successors, and do[es] not apply to the right of those persons to payment as determined by the terms of the account. Sections 15–15–221 to 15–15–227 (subpart 3) governs the liability and setoff rights of financial institutions that make payments pursuant to it.

Section 15–15–206.

In addition, under § 15–15–227, C.R.S. 2006, subject to other statutory rights to setoff, liens, and contractual provisions, a financial institution's right of setoff against a joint account is limited to the proportionate amount to which the debtor party is beneficially entitled under § 15–15–211 or, in the absence of proof of that proportion, an equal share with all parties. Under § 15–15–211(2), as quoted above, a party's beneficial entitlement is proportionate to its net contribution, absent evidence of a different intent. And in accordance with § 15–15–211(4), C.R.S.2006, "[a]n agent in an account with an

agency designation has no beneficial right to sums on deposit."

We conclude that plaintiff has sufficiently alleged a claim for conversion and presented sufficient evidence to the trial court to create genuine issues of material fact regarding whether the credit union's appropriation of the certificate of deposit associated with the account was wrongful.

Accordingly, we conclude that the trial court erred when it granted summary judgment as to plaintiff's claim for conversion.

The judgment is reversed as to the claims entitled negligence and negligence per se, punitive damages, and conversion, and the case is remanded to the trial court for further proceedings on those claims in accordance with this opinion. The judgment is affirmed in all other respects.

WEBB and J. JONES, JJ., concur.