2014 COA 37M

**RYAN RANCH COMMUNITY ASSOCIATION, INC.,**
Plaintiff–Appellee,

v.

**John E. KELLEY, Kelly D. Kelley, Rick Zimmerman, and Lora Zimmerman,**
Defendants–Appellants.

**Court of Appeals Nos. 12CA2312 & 12CA2316**

Colorado Court of Appeals,
Div. II.

Announced March 27, 2014

As Modified on Denial of Rehearing
May 8, 2014

Austin, Pierce & Smith, P.C., Daniel J. Sullivan, Aspen, Colorado; The Witt Law Firm, Jesse Howard Witt, Denver, Colorado, for Plaintiff–Appellees

Kennedy Group, P.C., Charles R. Ledbetter, Denver, Colorado; Gordon & Rees LLP, John R. Mann, Denver, Colorado, for Defendants–Appellants John E. Kelley and Kelly D. Kelley

Frie, Arndt & Danborn, P.C., Paul R. Danborn, Arvada, Colorado, for Defendants–Appellants Rick Zimmerman and Lora Zimmerman

Opinion by JUDGE CASEBOLT

¶ 1 In this action by plaintiff, Ryan Ranch Community Association, Inc., a homeowners association (the HOA), to recover disputed assessments from defendants, John E. and Kelly D. Kelley (the Kelleys), and Rick and Lora Zimmerman (the Zimmermans), defendants appeal the summary judgment in favor of the HOA on its claim that they owed more than $75,000 for monthly assessments and related penalties and fees on their lots. The issue is whether the lots owned by defendants are subject to the servitudes set forth in the Declaration of Covenants, Conditions, and Restrictions (Declaration) of Ryan Ranch, particularly the obligation to pay assessments to the HOA. Contrary to the trial court's ruling, we conclude that the lots are not subject to the Declaration, and therefore reverse the judgment and remand for further proceedings.

## I. Background

¶ 2 The parties agree the following facts are undisputed.

¶ 3 In 2001, the Ryan Ranch, a large parcel of property located in Jefferson County, began to be developed. At that time, an Official Development Plan (ODP) listed John Kelley and the estate of Robert Ryan as owners, and Ryan Ranch, LLC, an entity owned by Charles Ochsner, as the developer. Ochsner's entity (Ochsner) later purchased most of the land that would become Ryan Ranch Filings 1 and 2.

¶ 4 As pertinent here, in early 2003, Ochsner verbally agreed to sell Kelley seven lots to be developed, later known as Lots 1–7, Block 13, Ryan Ranch Filing 2 (the Kelley Lots), which are the subject of this action.

¶ 5 In summer 2003, Kelley learned that Ochsner was going to sell the majority of the Ryan Ranch property to The Ryland Group, Inc. (Ryland), the entity that would eventually create the HOA and record the Declaration. Kelley confirmed with Ochsner and Ryland the prior verbal agreement to purchase the Kelley Lots from Ochsner and received assurances that Ryland was not going to purchase them. Moreover, although Ryland intended to form the HOA for the

development of the land, Ryland, Ochsner, and Kelley agreed that the Kelley Lots would not be included in the homeowners association to be formed by Ryland.

¶ 6 In September 2003, Ryland and Ochsner signed a contract for the sale of parcels in Ryan Ranch to Ryland in two phases, which specifically excluded the Kelley Lots, referring to them as "Seller's Lots."

¶ 7 In October 2003, consistent with their prior agreement, Ochsner and the Kelleys signed a written contract for the Kelleys to purchase the Kelley Lots. The Kelleys understood that those lots would be conveyed after the Ryan Ranch Filing 2 plat map was recorded. Ryland and Kelley also signed an agreement on October 15, 2003, providing that the Kelley Lots would not be subject to the maintenance obligations of the HOA to be formed by Ryland, and that Ryland would record covenants to exclude them from the HOA. Ryland, however, never recorded any such covenants.

¶ 8 The first phase of the Ochsner–Ryland transaction was completed on October 29, 2003, and the Ryan Ranch Filing 1 plat map was recorded on November 13, 2003. Ochsner, however, did not timely obtain approval of the Filing 2 plat map for recording, and the sale of the Kelley Lots to the Kelleys did not occur at the time specified in that contract.

¶ 9 After Ryland filed articles of incorporation for the HOA, in March 2005 it recorded the Declaration of Ryan Ranch Community Association, encumbering Filing 1. Specifically, the Declaration stated that Ryland "desires to subject and place upon the real property described on the attached Exhibit A certain covenants, conditions, restrictions ... obligations, liabilities and other charges." The Declaration further declared "that all of the real property described on the attached Exhibit A shall be held, sold and conveyed subject to the following covenants, conditions, restrictions, ... obligations, liabilities, charges and other provisions set forth herein." The obligations included the duty to pay assessment fees. Exhibit A did not contain the Kelley lots.

¶ 10 The Declaration also provided that other property could be annexed into the community pursuant to Article XII, section 5. The Declaration described the property that was "annexable property" as all individual lots within Filing 1 and other land "to the extent it is owned at the time of annexation by Declarant, or if not owned by Declarant[,] with the written consent of the owner thereof," and provided a metes and bounds description of the entirety of Ryan Ranch Filing 2, which included the Kelley Lots.

¶ 11 Because of delays in obtaining Jefferson County's approval for the Ryan Ranch Filing 2 plat map, Ochsner's sale to Ryland of the land comprising Filing 2 was delayed. In agreements to extend closing, Ochsner and Ryland agreed that closing would occur after the recording of the Filing 2 plat map, but not later than June 16, 2005.

¶ 12 In May 2005, with the Filing 2 plat map supposedly nearing approval, the Kelleys and Ochsner reaffirmed their 2003 contract by signing a second contract for the sale of the Kelley Lots, which called for closing on June 10, 2005.

¶ 13 For various reasons, the Filing 2 plat map was not recorded as expected. On June 15, 2005, Ryland agreed to waive its right to condition closing on the final approval of the Filing 2 plat map so it could proceed with closing. That same day, Ryland recorded a Memorandum of Contract giving notice of its intent to purchase all of Filing 2 except the Kelley Lots. However, Ochsner and Ryland then changed their agreement (apparently for tax reasons) to provide that Ochsner would convey all Filing 2 property, including the Kelley Lots, to Ryland at closing the next day, and Ryland would then sign a deed reconveying the Kelley Lots back to Ochsner.

¶ 14 Although the Ochsner–Kelley contract called for closing on June 10, those parties agreed to postpone closing. The Kelleys, however, did not know of or agree to the conveyance by Ochsner of the Kelley Lots to Ryland, or the agreement for reconveyance.

¶ 15 On June 16, 2005, Ochsner completed the sale to Ryland and recorded a deed that included the Kelley Lots. The same day, Ryland signed a deed reconveying the Kelley Lots to Ochsner, but did not record it. On June 22, 2005, Ochsner signed a warranty deed conveying the Kelley Lots to the Kelleys, but did not record it.

¶ 16 Ryland recorded the Ryan Ranch Filing 2 plat map on November 17, 2005. The plat map included the Kelley Lots. Pursuant to Ryland's arrangement with Ochsner, the reconveyance deed, which conveyed the Kelley Lots from Ryland back to Ochsner, was recorded on December 20, 2005. That same day, Ochsner recorded the deed conveying the Kelley Lots to the Kelleys.

¶ 17 Ryland never intended the recording of either the Filing 2 plat map or the Ryland–Ochsner reconveyance deed to result in the annexation of the Kelley Lots into the Ryan Ranch community. Instead, Ryland understood and agreed that they would be excluded.

¶ 18 Although the evidence established that Ryland's consistent procedure to annex property required recording a separate instrument entitled "Annexation of Additional Land to Declaration of Covenants, Conditions and Restrictions of Ryan Ranch Community Association," no such instrument was recorded to annex the Kelley Lots. Although the Declaration recites a formula to calculate the reallocation of allocated interests upon annexation, none of the recorded instruments, including the Filing 2 plat map and the June 16, 2005, special warranty deed, states any resulting reallocation of the allocated interests or describes the common elements and the limited common elements created by annexation, or designates the unit to which each limited common element is allocated.

¶ 19 In June 2006, the Kelleys sold one of the Kelley Lots to a contractor who, after constructing a home on the property, sold that lot to the Zimmermans.

¶ 20 In September 2010, the HOA asserted, for the first time, that the Kelley Lots had been "automatically annexed" to the Ryan Ranch Community because of Ochsner's conveyance to Ryland of all Filing 2 property, including the Kelley Lots, and Ryland's subsequent reconveyance of them to

Ochsner. It therefore sought to recover past assessments, penalties, and fees from defendants.

¶ 21 The HOA's complaint asserted claims for unpaid assessments, breach of contract, unjust enrichment, and foreclosure of liens it had recorded on the Kelley Lots. The Kelleys and the Zimmermans counterclaimed for a declaratory judgment that Ryland did not annex the Kelley Lots in compliance with the Colorado Common Interest Ownership Act (CCIOA), sections 38–33.3–101 to –401, C.R.S.2013, or the Declaration, and asserted that principles of equitable conversion operated to preclude the transfer of the Kelley lots from Ochsner to Ryland.

¶ 22 Following discovery, the HOA moved for summary judgment, contending that annexation of the Lots had occurred, rendering them subject to the HOA's assessments. Defendants requested the court to determine as a matter of law that the Declaration did not apply to their properties.

¶ 23 The trial court granted the HOA's motion and denied defendants' motion. The court first ruled that the Kelley lots had been properly annexed under CCIOA. Contrary to defendants' arguments, the court ruled that the deeds, plat maps, ODP, and the Declaration, taken together, met the requirements of section 38–33.3–210, C.R.S.2013, which governs the exercise of development rights and requires preparation and recordation of an amendment to the Declaration. In reaching this conclusion, the court noted that CCIOA does not define "amendment," but it relied on the definition of the term "declaration" contained in CCIOA that includes "any recorded instruments however denominated, that create a common interest community, including any amendments to those instruments and also including, but not limited to, plats and maps." § 38–33.3–103(13), C.R.S. 2013. The court stated that it would not overly rely on the form of the purported amendment, but would instead focus on whether the instruments as a whole formally revised or added to a relationship that constituted a common interest community.

¶ 24 The court noted that the deed of June 16, 2005, from Ochsner to Ryland conveyed all of Filing 2, which included the Kelley Lots, and that the deed also included an exhibit, entitled "permitted exceptions," which explicitly refers to an exception for all notes, terms, provisions, and conditions as shown on the final plat of Ryan Ranch Filing 2, dated May 26, 2005. That plat, the court noted, included the obligation of a homeowners association to maintain various properties, and it concluded that the Kelleys were on inquiry notice of the language of the deed to subject their land to the covenants found in the ODP, which was recorded in January 2001, and the Declaration, which was recorded in March 2005.

¶ 25 The trial court next ruled that the exercise of the development rights over Ryan Ranch Filing 2 complied with the Declaration. It concluded that Ryland was the owner of the Kelley Lots at the time of annexation and rejected defendants' argument that the Kelleys were the equitable owners under the doctrine of equitable conversion. It also concluded that the Declaration did not require the use of a specific form to annex the Kelley Lots.

¶ 26 Finally, the court rejected defendants' contention that the parties involved in these various transactions never intended that the Kelley Lots would become part of the Ryan Ranch Community. The court reasoned that no one provided notice to future members of the HOA that the lots would be excluded and that the contract between Ryland and the Kelleys could not bind the HOA. Further it held that, even if the intent of Ryland and the Kelleys was to exclude the lots, the legal effect of Ryland's actions was to subject the Kelley Lots to the Declaration, and that a mistake of law could not erase the legal effect of Ryland's actions. The court also held that it would be inequitable not to subject the Kelley Lots to the Declaration because they had received benefits from landscaping, snow removal, and other services provided by the HOA to property adjacent to the Kelley Lots. The parties later stipulated to the amount that was owed, and the court entered a final judgment that also awarded attorney fees to the HOA.

¶ 27 This appeal followed.

## II. Summary Judgment

¶ 28 Defendants contend that the court erred in granting summary judgment for the HOA. They raise three arguments: (1) the Kelley Lots were not annexed in compliance with CCIOA; (2) Ryland did not annex the Kelley Lots in compliance with the Declaration; and (3) Ryland did not "own" the Kelley Lots at the time of the alleged annexation. We agree with the first contention and thus need not address the remaining assertions.

### A. Standard of Review

¶ 29 Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed by the parties, demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* C.R.C.P. 56(c). We review de novo an order granting summary judgment. *McIntyre v. Bd. of Cnty. Comm'rs*, 86 P.3d 402, 406 (Colo. 2004).

¶ 30 We also review a trial court's interpretation and application of the law de novo. *Asphalt Specialties, Co. v. City of Commerce City*, 218 P.3d 741, 745 (Colo.App.2009) (statutory interpretation is a question of law subject to de novo review). Likewise, we construe restrictive covenants de novo, *Rossman v. Seasons at Tiara Rado Assocs.*, 943 P.2d 34, 36 (Colo.App.1996), as well as deeds, *Dep't of Transp. v. First Place, LLC*, 148 P.3d 261, 264 (Colo.App.2006), and declarations of covenants, conditions, and descriptions, *Buick v. Highland Meadow Estates at Castle Peak Ranch*, 21 P.3d 860, 862 (Colo. 2001).

### B. Law

¶ 31 CCIOA affects all the transactions involved here, and the Declaration specifically states that in the event of any conflict with CCIOA, the statute prevails over the Declaration. Indeed, "[e]xcept as expressly provided [in CCIOA], provisions of [CCIOA] may not be varied by agreement, and rights conferred by [CCIOA] may not be waived." § 38–33.3–104, C.R.S.2013. Accordingly, we first set forth the applicable statutory provisions.

¶ 32 CCIOA was enacted by the General Assembly in order to establish "a clear, comprehensive, and uniform framework for the creation and operation of common interest communities." § 38–33.3–102(1)(a), C.R.S. 2013. A common interest community is real estate described in a declaration that is subject to the payment of certain obligatory fees, such as real estate taxes, insurance premiums, and maintenance or improvement costs. § 38–33.3–103(8), C.R.S.2013.

¶ 33 A common interest community is created by recording a declaration in the real property records. § 38–33.3–201(1), C.R.S. 2013. A declaration describes the real property to be included in the common interest community and may include plats and maps describing the real estate affected. *See* § 38–33.3–103(13), C.R.S.2013. Additionally, a declaration must contain a description of any development rights and other special rights reserved by the declarant. § 38–33.3–205(1)(h), C.R.S.2013.

¶ 34 Section 38–33.3–210(1), C.R.S.2013, describes the procedures for exercising a retained development right. A declarant may add property to a common interest community that was not included at the time the declaration was recorded by exercising a development right reserved for such purpose. *See* § 38–33.3–103(14)(a), C.R.S.2013 ("Development rights" include "any right or combination of rights reserved by a declarant in the declaration to . . . [a]dd real estate to a common interest community," among others.)

¶ 35 To exercise such rights, a developer must comply with the plat and map requirements of section 38–33.3–209, C.R.S.2013, and prepare, execute, and record an amendment to the declaration. § 38–33.3–210(1). The latter statute prescribes how a declarant may exercise the right to annex or add real property. The declarant must

> prepare, execute, and record an amendment to the declaration and, in a . . . planned community, comply with the provisions of section 38–33.3–209 . . . . The amendment to the declaration must assign an identifying number to each new unit created and . . . . reallocate the allocated

interests among all units. The amendment must describe any common elements and any limited common elements thereby created and, in the case of limited common elements, designate the unit to which each is allocated to the extent required by section 38–33.3–208.

*Id.*

¶ 36 Further, section 38–33.3–217(3), C.R.S.2013, requires that an amendment to the declaration must be properly indexed:

Every amendment to the declaration must be recorded in every county in which any portion of the common interest community is located and is effective only upon recordation. An amendment must be indexed in the grantee's index in the name of the common interest community and the association and in the grantor's index in the name of each person executing the amendment.

## C. Application

■ ¶ 37 Defendants assert that, to exercise reserved development rights, CCIOA requires the recording of an amendment to the declaration, which must contain certain information and be properly indexed. They assert that the trial court erred in concluding that the recording of the ODP and the Declaration itself, when considered together with the Ochsner–Ryland deed conveying the Kelley Lots and the filing of the Filing 2 plat map, could constitute a valid amendment. We agree.

¶ 38 CCIOA does not define the term "amendment." Accordingly, we must determine the meaning of that term.

¶ 39 Our primary duty in interpreting statutes is to give full effect to the intent of the General Assembly. *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo. 2005). If statutory terms are clear, we apply them according to their plain and ordinary meaning. *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 326 (Colo.2004). We may discern such meaning from the context in which statutory terms appear, by reference to the meaning of other terms associated with them, *Platt v. Aspenwood Condo. Ass'n*, 214 P.3d 1060, 1063 (Colo.App.2009), and by reference to the dictionary, *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1194 (Colo.2003).

¶ 40 The term "amendment" is generally understood to mean "[a] formal revision or addition proposed or made to a statute, constitution, pleading, order, or other instrument; specif., a change made by addition, deletion, or correction." *Black's Law Dictionary* 94 (9th ed.2009).

¶ 41 From this definition we discern two things. First, there must be an object to which an amendment will relate. Here, the object is a declaration. *See* § 38–33.3–210(1) ("amendment to the declaration"). Second, there must be a revision, addition, or change to that declaration, which connotes that an amendment chronologically follows its earlier object.

¶ 42 Employing that definition here, we conclude that the trial court erred in relying upon the ODP and the Declaration itself in determining whether Ryland properly "amended the declaration," because those documents were created and recorded before the purported annexation. For that reason, they could not revise, add to, or change the Declaration. One cannot logically consider the original document to constitute a change or addition to itself. *See* § 38–33.3–209(6) ("Upon exercising any development right, the declarant shall record an amendment to the declaration with respect to that real estate reflecting *change* as a result of such exercise." (emphasis added)).

¶ 43 Furthermore, the statute requires "the declarant" to prepare, execute, and record the amendment to the declaration. § 38–33.3–210(1). The ODP was not prepared by Ryland. *See* § 38–33.3–103(12) (defining "declarant" as "any person or group of persons acting in concert who (a) ... offers to dispose of to a purchaser such declarant's interest in a unit not previously disposed of to a purchaser; or (b) [r]eserves or succeeds to any special declarant right").

¶ 44 In addition, even if those two documents could be considered part of an amendment, they add nothing to the analysis of whether an amendment to the Declaration annexing the Kelley Lots occurred here.

Kelley signed the ODP below a statement that he "as owner of the land affected by this Planned Development, accept[s] and approve[s] all conditions set forth herein." But the only pertinent condition stated in the ODP was an acknowledgment that there would be a mandatory homeowners association. The ODP does not contain covenants or subject the property to any future covenants that might be contained in the Declaration. Hence, it could not "affirm [the Kelleys'] acceptance of the conditions imposed by the Ryan Ranch planned development," as the trial court held. At most, the ODP places a purchaser on notice that a mandatory homeowners association would be formed.

■ ¶ 45 The trial court also relied on the Ochsner–Ryland deed of June 16, 2005, which contains an "Exhibit B," listing the Filing 2 plat map as an exception to the general warranty clause. The court stated that the Kelleys would have been on "inquiry notice of the language in the instrument to subject their land to the covenants found in the [ODP] and in the Declaration." However, no language in the deed actually subjects the property to the Declaration or annexes the Kelley Lots. The deed merely excepts "covenants, conditions . . . and rights of way of record, if any" from the warranty of title. *See* § 38–30–113(2), C.R.S.2013 ("the words 'warrant(s) the title' in a warranty deed as described in subsection (1)(a) of this section . . . mean that the grantor covenants: . . . (b) [t]hat the same was free and clear from all encumbrances, except as stated in the instrument"); *O'Brien v. Vill. Land Co.,* 794 P.2d 246, 250 (Colo.1990) (a covenant of general warranty is a guarantee that the grantor is vested of an estate in fee simple with full power to convey, that the property is free of all encumbrances except as listed in the deed, and that the grantor will guarantee title; exceptions inserted into a covenant of warranty are intended only to protect the grantor on the warranty).

¶ 46 In addition, the deed does not satisfy the requirements set forth in section 38–33.3–210. It does not denominate itself as an amendment; it does not assign an identifying number to each new unit created, or reallocate the allocated interests among all units;

it does not describe any common elements thereby created; and it was not properly indexed in the name of the Ryan Ranch community.

¶ 47 Furthermore, the HOA has pointed to nothing in the Ryan Ranch Filing 2 plat map that subjects the property described in it to the Declaration, nor have we found any. The Filing 2 plat map does not amend the Declaration—it simply subdivides Tract H of Ryan Ranch Filing 1 into separate lots, blocks, and tracts of land and denominates it as Filing 2.

¶ 48 Moreover, the Filing 2 plat map did not annex any additional property into the Ryan Ranch Community, or reallocate the allocated interests of all the lots it created. Nor was it properly recorded in the grantor-grantee indices as required by section 38–33.3–210.

¶ 49 It is true that some of the restrictions in the Filing 2 plat map anticipate obligations of the HOA to maintain landscaped areas and access drives, including portions adjacent to the Kelley lots. But this casts no light on whether the map constitutes an amendment or complies with statutory requirements therefor.

¶ 50 Accordingly, even viewing the ODP, Declaration, the Ochsner–Ryland deed, and the Filing 2 plat map together, they do not constitute an amendment to the Declaration within the meaning of section 38–33.3–210 sufficient to annex the Kelley lots, and the trial court erred in so concluding.

■ ¶ 51 The HOA nevertheless contends that section 38–33.3–210 does not apply because annexation of the Kelley Lots did not require exercise of reserved declarant rights. It also asserts that the Kelley Lots were included within the original Declaration. We disagree.

■ ¶ 52 We first note that the HOA did not make these arguments in the trial court. Even so, because we may affirm a correct judgment for any reason supported by the record, *see Rush Creek Solutions v. Ute Mtn. Ute Tribe,* 107.P.3d 402, 406 (Colo.App.2004), we will address them.

¶ 53 Under section 38–33.3–210(1), the declarant must prepare an amendment "to ex-

ercise any development right reserved under section 38–33.3–205(1)(h)." Thus, section 210(1) only applies when a development right is reserved under section 205(1)(h).

¶ 54 Section 38–33.3–205(1) describes what a declaration must contain, and in subsection (h) specifies that it must include "[a] description of any development rights and other special declarant rights reserved by the declarant." "Development rights," in turn, is defined in section 38–33.3–103(14) as "any right or combination of rights reserved by a declarant in the declaration to: (a) [a]dd real estate to a common interest community."

■ ¶ 55 Accordingly, annexation of property, which adds real estate to a common interest community, is a development right, *see Miller v. Curry,* 203 P.3d 626, 629 (Colo. App.2009) ("CCIOA governs how a common interest community is created, *altered,* and terminated," (emphasis added)), and compliance with section 38–33.3–210 is required. *See* § 38–33.3–210(1) (to exercise a development right, that is, to annex, "the declarant *shall* prepare ... an amendment to the declaration"); § 38–33.3–209(6), C.R.S.2013 ("the declarant *shall* record an amendment to the declaration"); § 38–33.3–217(3), C.R.S. 2013 (every amendment to the declaration "*must* be recorded" (emphasis added)); *Willhite v. Rodriguez–Cera,* 2012 CO 29, ¶ 17, 274 P.3d 1233 ("the word 'shall' connotes a mandatory requirement"); *Silverview at Overlook, LLC v. Overlook at Mt. Crested Butte,* 97 P.3d 252, 255 (Colo.App.2004) (under CCIOA, "[u]se of the word 'must' connotes a requirement that is mandatory and not subject to equivocation.")

¶ 56 CCIOA therefore requires an amendment to the Declaration to accomplish annexation. *See* §§ 38–33.3–104, 38–33.3–203(3), C.R.S. 2013 (declaring that CCIOA trumps any inconsistent declaration term); *Abril Meadows Homeowner's Ass'n. v. Castro,* 211 P.3d 64, 68 (Colo.App.2009) (if the declaration does not comply with CCIOA, the declaration is invalid and unenforceable); *Miller,* 203 P.3d at 629 (failure to include reservation of development rights as required by statute meant no rights were retained); *Snowmass Land Co. v. Two Creeks Homeowners' Ass'n,* 159 P.3d 662, 664–65 (Colo.App.2006) (reser-

vation of development rights failed because it did not comply with statutory requirement).

¶ 57 The logical extension of this conclusion is that the different method for annexation set forth in the Declaration cannot apply here because it does not comport with the requirements of section 38–33.3–210. Hence, we need not address whether the purported annexation complied with that term of the Declaration, and the trial court's conclusion that annexation of the Kelley Lots was accomplished by following the method set forth in the Declaration was therefore incorrect.

■ ¶ 58 The HOA next asserts that because the Kelley Lots were mentioned in the Declaration, they were always within the homeowners association and thus amendment of the Declaration under CCIOA was not required for annexation. We reject the assertion.

¶ 59 As previously noted, the Declaration provides that its covenants, conditions, and restrictions encumber the real property described on its Exhibit A. That exhibit describes the community as "Tract A, B, C, E, F, and G, Ryan Ranch Filing 1." But the Kelley Lots were contained at that time in Tract H, Ryan Ranch Filing 1, and thus, they were not part of the real property subjected to the original Declaration.

¶ 60 The Declaration also states that "[a]dditional [p]roperty will be annexed into the Community in accordance with this Declaration." Exhibit D to the Declaration declares that "all or any portion of Tract H" is "annexable property." This term, in our view, means that the property described is capable or susceptible of being annexed. *See Random House Webster's College Dictionary* 4 (1991) (defining the suffix "-able"). The temporality of the term in the Declaration ("will be annexed") and the use of "annexable" in Exhibit D leads us to conclude that the property described in Exhibit D was not part of the property being subjected to the original Declaration but, instead, would be capable in the future of being so subjected and annexed provided some additional action were taken. The additional actions that were taken and upon which the trial court relied, however, did not comply with section 38–33.3–210(1).

And absent annexation in compliance with that provision, the Kelley Lots never became subject to the Declaration's encumbering language.

¶ 61 The HOA also asserts that the doctrines of actual and inquiry notice preclude granting relief to defendants, because they had notice or knowledge of the various instruments recorded in their chain of title when they received the deeds conveying the Kelley Lots to them. However, the HOA has cited no authority for the proposition that defendants' imputed knowledge of the real estate records defeats our conclusion that the Kelley Lots were never subject to the obligations set forth in the Declaration. Indeed, our conclusion that the Kelley Lots are not subject to the Declaration's terms makes it clear that the real estate records cannot have created any such notice or knowledge.

¶ 62 Nor are we persuaded that a different result is required by the Restatement (Third) of Property: Servitudes § 6.5(1) (2000), upon which the HOA relies. That section specifies that a homeowners association has the power to raise funds reasonably necessary to carry out its functions by levying assessments against the individually owned property in the community. Here, however, our conclusion that the Kelley Lots are not "within the community" defeats the application of that provision.

¶ 63 In light of our conclusion that the Kelley Lots were not rendered subject to the terms of the Declaration, we need not address defendants' remaining contentions.

¶ 64 Our determination resolves the HOA's claims for breach of contract, recovery of unpaid assessments, and foreclosure of liens (which are invalid in light of our conclusion). It also requires that we vacate the trial court's award of attorney fees and costs to the HOA. However, we do not perceive that our determination necessarily resolves the unjust enrichment claim or the affirmative defenses the HOA raised in response to the counterclaims asserted by the Kelleys and the Zimmermans.

¶ 65 In a stipulation attached to the HOA's motion for entry of judgment, filed after the trial court granted the summary judgment, the parties stipulated to dismiss the unjust enrichment claim. However, no formal dismissal of the claim appears of record, and the terms of the stipulation indicate that the unjust enrichment claim was to be dismissed only if the court entered a money judgment on the assessment and breach of contract claims. In light of our reversal, the status of the unjust enrichment claim is unclear. Accordingly, on remand, the trial court must revisit that claim and determine whether, in light of our conclusion, the unjust enrichment claim remains viable and, if so, what further proceedings may be necessary. We express no opinion concerning the merits of such a claim.

¶ 66 The trial court must also consider whether any affirmative defenses defeat or limit a recovery on defendants' counterclaims.

### III. Attorney Fees

¶ 67 All parties request attorney fees. Under the Declaration and section 38–33.3–123(1)(c), C.R.S.2013, a prevailing party in a CCIOA dispute is entitled to reasonable attorney fees. Because it is not a prevailing party, we deny the request of the HOA. Because we conclude that defendants are the prevailing parties, we award attorney fees to defendants against the HOA. We exercise our discretion under C.A.R. 39.5 to remand the matter to the trial court to determine the amount of trial and appellate attorney fees to be awarded to defendants, and also to determine whether the HOA's affirmative defenses limit or preclude such an award. *See Hallmark Bldg. Co. v. Westland Meadows Owners Ass'n, Inc.*, 983 P.2d 170, 174 (Colo. App.1999).

### IV. Conclusion

¶ 68 The judgment is reversed, and the case is remanded to the trial court for further proceedings on the unjust enrichment claim and for entry of an award of reasonable attorney fees and costs in favor of defendants.

JUDGE ASHBY concurs.

JUDGE TERRY dissents.

JUDGE TERRY, dissenting.

¶ 69 Because I conclude that the homeowners association declaration was properly amended under section 38–33.3–210(1), C.R.S.2013, to add the Kelley Lots to the Ryan Ranch Community Association, Inc. (the HOA), and I would reject the appellants' other arguments, I would affirm the ruling of the trial court. Therefore I respectfully dissent.

## I. Additional Facts

¶ 70 In addition to the facts described in the majority opinion, I consider the following undisputed facts to be important to the decision of this appeal.

¶ 71 In January 2001, an Official Development Plan (the Plan) was recorded with Jefferson County for the land that would become the Ryan Ranch Community. The Plan indicates that the streets, landscaping, and other common areas would be maintained by a homeowners association to be formed in the future for that purpose. Both Charles Ochsner and John Kelley signed the Plan.

¶ 72 On October 15, 2003, the Kelleys entered into an agreement with The Ryland Group, Inc. (Ryland) that stated the Kelleys' intent to purchase the Kelley Lots from Ochsner, and agreed that when such purchase took place, the Kelley Lots would not be subject to any maintenance fee obligations of the HOA to be formed by Ryland. The agreement included a clause stating that Ryland would take action to record any covenants necessary to exclude the Kelley Lots from the HOA. It was signed by both parties. However, Ryland never took action to record any exclusion of the Kelley Lots from the HOA.

¶ 73 On November 13, 2003, the Filing 1 plat was recorded by Ryland. The Declaration of Covenants, Conditions, and Restrictions (Declaration) was recorded on March 11, 2005, formalizing the HOA as a common interest community under the provisions of the Colorado Common Interest Ownership Act (CCIOA), sections 38–33.3–101 to –401, C.R.S.2013. Ryland acted as the declarant for purposes of forming the HOA under CCIOA. The Declaration includes an obligation for homeowners to pay assessment fees to reimburse the HOA for the cost of maintenance, and for ordinary expenses of operation.

¶ 74 The Declaration provides that the additional lots will be annexed into the HOA when (1) a plat for additional properties to be annexed is recorded and (2) either an annexation form is recorded, or a deed for real property within the plat is conveyed from Ryland to a third party other than Ryland. The Declaration includes a list of real property that may be annexed to the HOA, and that list contains a legal description of the Kelley Lots.

¶ 75 On May 26, 2005, the Kelleys signed a contract with Ochsner to purchase the Kelley Lots. Though it specified a closing date of June 10, 2005, Ochsner and the Kelleys agreed to defer the closing of the Kelley Lots until after the Filing 2 plat was recorded.

¶ 76 On June 15, 2005, Ochsner and Ryland entered into a Memorandum of Contract that stated that the Kelley Lots would be excluded from the property to be conveyed from Ochsner to Ryland when the Filing 2 properties were purchased by Ryland. However, when Ochsner conveyed the Filing 2 property to Ryland on June 16, 2005, the deed did not exclude the Kelley Lots. Thus, the Kelley Lots were conveyed to Ryland on that date. That same day, Ryland deeded the Kelley Lots back to Ochsner, but Ochsner delayed recording of the June 16th reconveyance deed until after subsequent conveyances were made.

¶ 77 On June 22, 2005, Ochsner conveyed the Kelley Lots to the Kelleys. The Kelleys did not record the deed to the Kelley Lots that day, and, according to John Kelley, did not do so because he agreed with Ochsner to wait to finalize the purchase until after the Filing 2 plat was recorded.

¶ 78 Ryland recorded the Filing 2 plat on November 17, 2005; that plat includes the Kelley Lots. The notes to the plat state that certain tracts (including those on or adjacent

to the Kelley Lots) are for common area landscape, utility, and pedestrian access purposes, and "shall be owned and maintained by the homeowners association." On December 20, 2005, Ochsner recorded the June 16 deed from Ryland that had reconveyed the Kelley Lots to him. That same day, the Kelleys recorded the deed from Ochsner that conveyed the Kelley lots to them.

¶ 79 The Kelleys sold Lot 6 to a contractor who built a home on that lot, and sold it to the Zimmermans. The Zimmermans' title search disclosed that Lot 6 was subject to the Declaration and the Filing 2 plat.

## II. Discussion

### A. Compliance with CCIOA

¶ 80 I conclude that the amendment to the Declaration complied with the applicable provisions of CCIOA.

#### 1. Annexation and Amendment of Declaration

¶ 81 The majority concludes that the trial court erred when it found that certain written instruments, taken as a whole, constituted an amendment to the Declaration in compliance with CCIOA. Although I disagree with the trial court's analysis of how the annexation and amendment were accomplished, I conclude that the Kelley Lots were properly annexed to the HOA and that the Declaration was properly amended. *See Hiner v. Johnson*, 2012 COA 164, ¶ 2, 310 P.3d 226 (if trial court reaches correct result, appellate court may affirm on different grounds).

¶ 82 Section 38–33.3–210 describes the procedures for exercising a development right. A declarant may add property to a common interest community that was not included at the time the declaration was recorded by exercising a development right reserved for such purpose. *See* § 38–33.3–103(14)(a), C.R.S.2013 ("Development rights" include "any right or combination of rights reserved by a declarant in the declaration to . . . [a]dd real estate to a common interest community," among others.). To exercise such rights, the declarant must comply with the plat and map requirements of section 38–33.3–209, C.R.S.

2013, and record an amendment to the declaration. § 38–33.3–210(1).

¶ 83 As noted above, the Declaration provides that the additional lots will be annexed into the HOA when (1) a plat for additional properties to be annexed is recorded and (2) either an annexation form is recorded, or a deed for real property within the plat is conveyed from Ryland to a third party other than Ryland.

¶ 84 On November 17, 2005, Ryland recorded the Filing 2 plat, which included the Kelley Lots. On December 20, 2005, Ryland conveyed the Kelley Lots to Ochsner by deed. These two actions—filing of the plat and conveyance by deed—fulfilled the requirements of the Declaration to annex real property to the HOA.

¶ 85 Contrary to the majority's conclusion, I conclude that the requirement for filing of an amendment to the Declaration was accomplished when the Filing 2 plat was recorded on November 17, 2005. *See* § 38–33.3–103(13) (defining "declaration" as including "plats"); *see also* § 38–33.3–209(1) ("[a] plat . . . is a part of the declaration"); § 38–33.3–102(1)(c), C.R.S.2013 (in enacting CCIOA, the General Assembly intended "to give developers flexible development rights . . . within a uniform structure of development of a common interest community").

¶ 86 To the extent the majority suggests that the amendment was not effective because it was not "denominated" as an amendment, I disagree because section 38–33.3–210 contains no such requirement. And, it is irrelevant that the amendment was not accomplished by filing the form which Ryland normally uses for filing amendments. By filing the plat—a document that, by statute, is included within the definition of a "declaration"—Ryland amended the Declaration.

¶ 87 Therefore, I conclude that the Kelley Lots became part of the HOA and subject to the Declaration.

¶ 88 The Kelleys argue that neither Ryland nor the Kelleys ever intended to allow annexation of the Kelley Lots. As support for this view, they cite to the October 15, 2003, Ryland–Kelley Agreement. That Agreement stated that Ryland was to record a covenant

to exclude the lots from the HOA. However, Ryland never recorded such an exclusion, and, in my view, its side agreement cannot defeat the Kelleys' obligation to pay the HOA fees. *See* § 38–33.3–104, C.R.S.2013 ("provisions of this article may not be varied by agreement.... A declarant may not ... use any ... device to evade the limitations or prohibitions of this article or the declaration."); *see also* Restatement (Third) of Property: Servitudes § 6.5 cmt. e (2000) (members are not "entitled to set up agreements reached with the developer as defenses to the obligation to pay assessments.... [T]he developer does not have the power to waive the assessment obligations imposed on property within the common-interest community.").

## 2. Compliance with Technical Requirements

¶ 89 I am also not persuaded by the argument of the Kelleys and the Zimmermans that the recording of the Filing 2 plat does not comply with the portion of section 38–33.3–210(1) stating that any amendment to the Declaration must "assign an identifying number to each new unit created[,] ... reallocate the allocated interests among all units[, and] ... describe any common elements" created.

¶ 90 In my view, it was not necessary for the Filing 2 plat to comply with these technical requirements because the annexation clause of the Declaration specifically provided for such actions to take place automatically upon the recording of a plat and a conveyance deed from Ryland. The Declaration assigned unit numbers and contained a formula that automatically reallocated interests in the common areas upon annexation of additional property. Therefore, any additional description, in an amendment, of the allocation of interests, the common elements, or the identification of unit numbers would have served no purpose. *Westesen v. Olathe State Bank*, 75 Colo. 340, 344, 225 P. 837, 839 (1924) (the law does not require performance of futile acts); *Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1024 (Colo.App.2005) (same); *see also Golden Canal Co. v. Bright*, 8 Colo. 144,

149, 6 P. 142, 149 (1885) (where statute required two separate filings, but a party filed one that accomplished both purposes, supreme court ruled that the single filing was sufficient to comply with statute); *Burns v. Bd. of Assessment Appeals*, 820 P.2d 1175, 1178 (Colo.App.1991) ("If a strict, literal, or technical interpretation of the words of a statute leads to an absurd ... result ... such interpretation must yield to allow the intended purpose to be carried out.").

¶ 91 Section 38–33.3–217(3), C.R.S.2013, requires that an amendment be listed in the grantee's index in the name of the common interest community and the association, as well as in the grantor's index in the name of each person executing the amendment. The Kelleys and the Zimmermans argue that the amendment does not comply with this statutory requirement, and therefore the amendment was invalid. I conclude that reversal is not required on this basis.

¶ 92 When Ryland recorded the Filing 2 plat map, it listed "Ryan Ranch Filing 2" as the grantee, rather than "Ryan Ranch Community Association." However, this was, at most, a technical defect that caused no actual prejudice to the Kelleys or the Zimmermans. *See Golden Canal Co.*, 8 Colo. at 149, 6 P. at 149; C.A.R. 35(e) (appellate court shall disregard any error or defect not affecting the substantial rights of the parties).

¶ 93 John Kelley signed, as an owner, the Development Plan for the property that became part of the HOA and included the Kelley Lots. The notes in the plan indicate that the streets, landscaping, and other common areas would be maintained by a homeowners association. John Kelley also knew that the Kelley Lots would need to be excluded from the association, and was aware of the recording of the Filing 2 plat, which shows the Kelley Lots as being, in part, subject to tracts owned and maintained by the association. This knowledge put him on inquiry notice that the Kelley Lots were included in the HOA. *See Martinez v. Affordable Hous. Network, Inc.*, 123 P.3d 1201, 1206 (Colo. 2005) ("Inquiry notice arises when a party ... should have become aware of certain facts which, if investigated, would reveal the

claim of another." (internal quotation marks omitted)).

¶ 94 The record demonstrates that the Zimmermans suffered no prejudice as the title search of their property disclosed both the Declaration and the Filing 2 plat map, providing them with notice that their property was included in the HOA.

¶ 95 For these reasons, I conclude that the trial court did not err in rejecting the Kelleys' and the Zimmermans' challenges to the annexation of their properties based on the provisions of CCIOA.

### B. Equitable Ownership

¶ 96 Given my resolution of the CCIOA issues, I must consider the further argument of the Kelleys and Zimmermans: that the Kelleys acquired equitable ownership of the Kelley lots in May 2005, and therefore their written consent to annexation of those lots was required. I reject that argument for the following reasons:

- Colorado precedents do not establish that a holder of equitable title in an unrecorded contract is entitled to all the incidents of ownership of the property. *See Jacquez v. Jacquez,* 694 P.2d 1292, 1294 (Colo.App.1984) ("Even if we assume that the document entitled 'contract' had some legal effect, ... at best it was a conditional promise to convey analogous to an executory contract.").

- The Kelleys and the Zimmermans would need to establish an entitlement to equitable relief from the court based on the Kelleys' equitable title. *See First Nat'l Bank of Wray v. McGinnis,* 819 P.2d 1080, 1083 (Colo.App.1991) (purchaser under executory contract for sale of land becomes equitable owner, allowing purchaser to maintain quiet title action); *Bent v. Ferguson,* 791 P.2d 1241, 1243 (Colo.App.1990) (same).

- Granting of such equitable relief was within the trial court's discretion, and the court's refusal to exercise that discretion may not be disturbed unless its ruling was manifestly arbitrary, unreasonable, or unfair. *See Redd Iron, Inc.*

*v. Int'l Sales & Servs. Corp.,* 200 P.3d 1133, 1136 (Colo.App.2008); *E–470 Pub. Highway Auth. v. Revenig,* 140 P.3d 227, 230 (Colo.App.2006).

- The trial court did not abuse its discretion in denying equitable relief for the following reasons:

- The Kelleys purposely waited to close the purchase of the Kelley lots until after recording of the Filing 2 plat. The plat showed the Kelley lots as at least abutting (if not incorporating) Tracts V and X. The plat notes describe those tracts as being for common area landscape, utility, and pedestrian access purposes, and state that the tracts "shall be owned and maintained by a homeowners association." Thus, before completing the purchase of the Kelley lots, the Kelleys were on at least inquiry notice of the Filing 2 plat, showing that a homeowners association would own these tracts affecting the Kelley lots.

- The Kelleys could have discovered prior to closing their purchase that Ryland had not recorded any documents excepting the Kelley lots from the HOA, as Ryland had contracted to do two years earlier in its agreement with John Kelley.

- The November 17, 2005, Subdivision Improvements Agreement between Ryland and Jefferson County required Ryland to provide to the County a title commitment showing that "fee simple title of all the lands in the subdivision is vested totally" in Ryland. The Kelleys, as developers of their lots, apparently benefitted from that agreement, wherein the county approved the subdivision.

- John Kelley signed the Development Plan for Ryan Ranch, which stated that "[p]rivate streets shall be maintained by a mandatory homeowners association."

- The court could have applied the doctrine of laches to conclude that Kelley and Zimmerman waited too long to assert the equitable ownership

claim after receiving at least record notice of the lots' inclusion in the HOA. *See City of Thornton v. Bijou Irr. Co.,* 926 P.2d 1, 73 (Colo.1996).

¶ 97 For all of the foregoing reasons, I would affirm the decision of the trial court.